**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

—————————————————— :
RUSSELL ZURAWEL,                    :    Civil Action No. 07-5973(FLW)
                                    :
            Plaintiff,              :            **OPINION**
                                    :
        vs.                         :
                                    :
THE LONG TERM DISABILITY            :
INCOME PLAN FOR CHOICES             :
ELIGIBLE EMPLOYEES                  :
OF JOHNSON & JOHNSON, JOHNSON       :
& JOHNSON HEALTH AND WELFARE        :
BENEFIT PLAN, and THE PENSION       :
COMMITTEE OF JOHNSON &              :
JOHNSON                            :
                                    :
            Defendants.             :
—————————————————— :

**WOLFSON, District Judge**:

        This is the Court's determination of two separate Motions for
Summary Judgment filed by Plaintiff Russell Zurawel ("Zurawel" or
"Plaintiff") and Defendants The Long Term Disability Income Plan
for Choices Eligible Employees of Johnson & Johnson ("LTD Plan"),
The Johnson & Johnson Choices Benefit Program, incorrectly pleaded
as "Johnson & Johnson Health and Welfare Benefit Plan" (the
"Plan"), and the Johnson & Johnson Pension Committee (the
"Committee") (collectively, "Defendants").  Plaintiff alleges that
Defendants 1) wrongfully denied his benefits pursuant to the LTD
Plan; 2) wrongfully denied his short-term disability benefits

pursuant to the Plan; 3) violated their fiduciary duties as trustees of the Plan, in contravention of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001(a)(1)(B), et seq.; and 4) failed to provide claim documents in violation of 29 C.F.R. § 2560.503-1(h)(2)(iii).  For the reasons that follow, the Court denies Plaintiff's Motion for Summary Judgment and grants Defendant's Motion for Summary Judgment, thereby affirming the denial of benefits.

## I.    **Factual Background**

Plaintiff worked for Defendant Johnson & Johnson ("J&J") as a medical writing scientist from June 25, 2001 to October 24, 2004. AR 276, 315.  At the age of 18, in 1986, he was involved in a motor vehicle accident that severely injured his spine and caused him to be bound to a wheelchair for several years.  AR 276.  After several reconstructive surgeries and extensive rehabilitation, Plaintiff was able to regain his ability to walk, but had a significantly altered gait, and required the assistance of a cane.  AR 275, 277. Thereafter, he pursued a career in biomedical research and obtained a Ph.D. in molecular neuroscience.  AR 559.  Over the years, Plaintiff was not without medical problems.  Because of the severity of his spinal injuries, Plaintiff experienced recurring pain.  AR 559.  He managed the pain with a steady dose of narcotic pain medicine.  AR 277.  Because of his need to cope with the pain, Plaintiff abused his medication and alcohol, and was admitted to

2

drug addiction programs on four separate occasions in 1994, 1998, 2000, and 2004.  AR 275.  He was also a self-professed alcoholic. Id.

In 2001, shortly after he was employed by J&J, Plaintiff came under the care of Dr. John P. Kripsak, D.O., who served as Plaintiff's primary treating physician for the relevant periods of Plaintiff's disability claims.  AR 410-26.  In 2002, Plaintiff sought consultation from Dr. Allen Carl, M.D., an orthopedic surgeon, complaining of worsening symptoms.  AR 842.  On the first visit on July 24, 2002, Dr. Carl stated that "I might have seen him ten years ago for the last time.  His neurologic status hasn't changed."  AR 842.  As to the worsening symptoms, Dr. Carl opined "[t]he real question is this due to muscle deconditioning over some period of time in an area that has been damaged.  Is it due to an area that is not healed and I can't tell by looking at all the overlying shadows."  Id.  Dr. Carl also opined that a CT scan might help with additional diagnostics.  Id.  To help with Plaintiff's symptoms, Dr. Carl recommended that Plaintiff find  a physical therapist closer to home and attempt some trunk strengthening exercises.  AR 842-43.

As per Dr. Carl's recommendation, Plaintiff obtained a CT scan on September 18, 2002.  AR 840.  The CT scan showed that there were "marked levoscoliosis in the upper lumbar spine maximum at L1-L2 where there is a large left sided osteophyte and marked disc space

3

narrowing on the right." Id. "The posterior fusion appears solid T11 and T12. In addition there has been bone fusion." Id. "On several of the images, there appears to be a fracture in the bone of fusion graft which is within the central portion of the vertebral bodies. Although the posterior margin of the bone fusion projects into the upper lumbar canal at the L2 level but the effective AP canal diameter is still well within normal limits." Id. "The facets between L1 and L4 are degenerated or ankylotic. The last truly visible set of facets at L4-S and those at L5-S1 show degenerative changes only." AR 840-41.

Plaintiff returned to Dr. Carl on September 18, 2002. AR 835. Dr. Carl stated that "the CT scan revealed everything from the previous surgery to be solid." Dr. Carl still could not definitively determine the root cause of Plaintiff's worsening symptoms, and suggested additional diagnostic techniques to try to isolate the root cause. Id. Dr. Carl prescribed some pain medicine to alleviate Plaintiff's pain. Id. There are no records of further testing or findings within the record; this was the last visit Plaintiff had with Dr. Carl.

Finally, on October 24, 2004, Plaintiff claimed that his condition had deteriorated to the point where future employment was impossible, and he filed for disability benefits. AR 559.

## A.   The Plan

The Plan, established by J&J, contains, among other things, coverage for employees of J&J for short-term disability ("STD") and long-term disability ("LTD").   AR 1090.   The LTD Plan was established pursuant to ERISA, while the STD Plan is not covered by ERISA.   Id.   The STD Plan is fully funded by J&J for all employees, and the LTD portion is a voluntary program that is funded through employee contributions.   Id.   The LTD Plan, pursuant to ERISA, gives an internal Pension Committee discretionary authority to interpret the terms of the Plan and administer benefits.   AR 1004. Both plans are administered by a third-party company hired by Defendants.   At first the administrator was Broadspire Services, but Broadspire was later changed to Reed Group on April 1, 2006 (collectively, "the Administrator").   AR 571.   Under the LTD Plan, the Administrator makes the initial claims determination and first appeal, and, if claimant disagrees with the decision, he/she can appeal to the Pension Committee, whose decision is final.   AR 1103, 1105-06.

## B.   Plaintiff's STD Claim

Plaintiff filed a claim for STD benefits on November 1, 2004. AR 315.   The STD claim was initially approved and subsequently extended until February 28, 2005.   AR 338.   In order to determine whether Plaintiff was disabled, the Administrator requested, on three separate occasions, Attending Physician Statements from Dr.

Krispak. In the first statement, dated November 11, 2004, Dr. Krispak assessed that Plaintiff would not be able to return to work until December 20, 2004. AR 859. In the second statement, dated January 4, 2005, Dr. Krispak stated that he was unable to determine a return-to-work date. AR 853. In the final statement, Dr. Krispak assessed that Plaintiff needed "at least 8 more weeks" before returning to work.  AR 860.  At some point, Plaintiff also submitted all the treatment notes from Dr. Krispak to the Administrator.  AR 347.

On March 7, 2005, the Administrator hired a medical consultant, Dr. Lawrence Blumberg, M.D., an orthopedic surgeon, to assess whether Plaintiff was disabled between March 7, 2005, and April 25, 2005.  AR 347.  As part of his investigation, Dr. Blumberg called Dr. Krispak for a peer-to-peer discussion on March 7, 2005.  AR 348.  After considering all the available medical records at that time and his discussion with Dr. Krispak, Dr. Blumberg determined that "the information fails to support a functional impairment that precludes work from 03/07/05 through 04/25/05." AR 347.  Dr. Blumberg stated in his report that, "[i]n the records provided, there is no physical examination. Specifically, no range of motion testing, motor strength testing or neurologic findings.  Additionally, there is no current objective testing such as EMG and nerve conduction studies, x-rays, or MRI results."  AR 347-48.  Dr. Blumberg also summarized his

conversation with Dr. Krispak: "[h]e did not have any specific physical examination in his records, but stated that the claimant had decreased range of motion and pain with activity.  The claimant had difficulty walking.  However, Dr. Krispak could not see any reason why the claimant could not perform sedentary work activities, other than the fact that he has pain."  AR 348.  Based on Dr. Blumberg's findings, the Administrator discontinued payment of STD benefits and denied Plaintiff's STD claim for the remainder of the applicable STD period.  AR 231.

During this time, as Plaintiff's claim was on-going, Plaintiff sought additional medical treatment.  On November 16, 2004, Plaintiff visited Dr. Michael E. Rudman, M.D., a pain management specialist.  AR 275.  Plaintiff told Dr. Rudman that, "[h]e has been tried on anti-inflammatories, narcotics, anti-seizure medication and steroids.  He has also done acupuncture and a TENS unit in the past.  He also states he has been through multiple courses of physical therapy and medications."  AR 276.  Dr. Rudman commented that Plaintiff was "looking for alternative strategies to try to deal with his pain and I spoke with him today in detail regarding behavioral therapies as well as the possibility of a spinal cord stimulation therapy as a possibility for his lower extremity pain complaints."  Id.  Upon examination, Dr. Rudman stated that Plaintiff's "[n]umeric pain score is 5/10.  He gets up very slowly.  He has an unsteady gait.  He walks primarily on the

7

heels of his feet. He is unable to dorsiflex his left foot." Id.
Dr. Rudman also noted that Plaintiff had limited range of motion in
his lumbar spine, muscle tenderness, and reduced motor functions in
his lower body.  Id.  At the end of the visit, Dr. Rudman
recommended behavioral therapy and spinal cord stimulation, and
referred Plaintiff to a behavioral therapist.  Id.

Plaintiff visited a behavioral therapist, Dr. Anthony S.
Papciak, Ph.D., a clinical psychologist, on November 30, 2004. AR
277. Plaintiff discussed his medical history with Dr. Papciak and
told Dr. Papciak that he "rated his overall level of pain as mild
(4/10 on a 0-10 scale: 0 = no pain, 10 = very severe pain).  He
reported that his lowest level of pain is mild (4/10), and noted
that his highest level of pain is very severe (10/10), and on
average his pain during the day is severe (7/10)."  Id.  Dr.
Papciak observed that "[Plaintiff] was cooperative and forthcoming
during the interview, and carefully and thoughtfully provided the
information necessary for the assessment . . . .  The patient was
oriented x 3 and demonstrated no significant abnormalities in
recent or remote memory, attention span, and concentration during
the interview.  During the interview, his thinking was logical,
organized, and productive.  There was no evidence of a thought
disorder, hallucinations, delusions, or loose associations."  Id.
Dr. Papciak discussed cognitive behavioral treatment with
Plaintiff, but Plaintiff replied that he had done a significant

amount of psychological treatment in the past, and he felt "he had done all he could with current psychological treatments and was looking for something more alternative at this point in time." AR 279. No further appointments with Dr. Papciak were scheduled. Id.

Plaintiff returned to Dr. Rudman on the same day, after his visit to Dr. Papciak. AR 273. Dr. Rudman opined that "[a]t this time I don't think we have any other modalities to offer him here at the Pain Management Center per se. We discussed the rationale for even a consideration of a spinal cord stimulator, but really I think he is actually quite a poor candidate for this given the type of pain complaints that he has and I reviewed that with him and he agrees at this point in time." Id. Dr. Rudman examined Plaintiff again and observed "[n]umeric pain score is 2/10 today but as bad as 10/10 at other times. Examination shows no significant new findings." Id. A follow-up visit was scheduled. Id.

Plaintiff visited Dr. Rudman for a final time on January 11, 2005. AR 272. Dr. Rudman stated that he was "still trying to work out his low back and leg pain complaints." Id. "[Plaintiff] is receptive to trying these alternative techniques for working on dealing with his pain and we are trying to continue to pursue nonpharmacologic avenues." Id. Examination showed that "[n]umeric pain score is 4/10. He gets up fairly easily from a seated to a standing position." Id. No other new findings were observed. Id.

Plaintiff obtained an x-ray report of his lumbar spine on

February 16, 2005. AR 850.  The radiologist observed that "[t]here are no prior studies for comparison.  There are extensive rods and screws transfixing the lumbosacral spine.  There is severe levoscoliosis as well as multilevel degenerative changes difficult to evaluate while due to the overlying rods.  There appears to be posterior fusion as well at multiple lumbar levels."  Id.

Plaintiff also obtained a "lumbar evaluation" at Sports Care Physical Therapy on March 9, 2005.  AR 846.  The test documented results of a range of motion tests, and stated that Plaintiff experienced increased pain while sitting, standing, and lying down. Id.  The report opined that Plaintiff would likely be a poor candidate for rehab, but nevertheless, the physical therapist formulated a treatment plan, three times weekly for four weeks, designed to "restore previous level of function."  AR 846-47.

On April 14, 2005, Plaintiff filed an appeal of his STD denial.  AR 228.  As part of his appeal, he submitted the following additional evidence:  the CT scan and Dr. Carl's records from 2002, Dr. Rudman's and Dr. Papciak's reports, the x-ray, the lumbar evaluation, additional records from Dr. Kripsak, and his personal statement regarding his condition and his rebuttal regarding Dr. Blumberg's discussion with Dr. Kripsak. AR 229.  The Administrator requested Dr. Robert Ennis, M.D., an orthopedic surgeon, to review all of the medical documents submitted by Plaintiff for the purpose of the appeal.  AR 367.  Dr. Ennis provided a summary of the

10

reports from Dr. Rudman, as well as the report from Dr. Blumberg. AR 369.  Dr. Ennis opined that "[a]t the present time, from an orthopedic perspective, there are no specific objective findings that would support a functional impairment from 03/16/05 onwards preventing the claimant from returning to sedentary activities." Id.  Dr. Ennis further opined that "[a]dditional documentation should include complete current orthopedic evaluation documenting the claimant's range of motion, muscle strength, ambulatory ability, and neurological status including reflexes, sensory and motor power and current radiographic and/or electrodiagnostic testing, if indicated.  A further evaluation of the claimant's current pain management status with level of medication would also be beneficial."[1]  Id.

**C.  Plaintiff's LTD Claim**

Plaintiff also filed for LTD benefits on May 3, 2005.  AR 364. While Plaintiff was seeking LTD benefits from Defendants, he also filed for and was granted Social Security disability benefits.  AR 452.  The Social Security Administration ("SSA") found that Plaintiff "became disabled under our rules on October 26, 2004." Id.  Payment of SSD benefits started on April 1, 2005.  Id.

_____

[1]    Plaintiff further appealed the STD claim on June 19, 2005.  AR 526.  His second appeal was ultimately denied on July 19, 2005.  AR 70.  However, as discussed *infra*, because Plaintiff's STD claim was ultimately resolved by granting him maximum benefits, this appeal is not relevant to this opinion and therefore will not be summarized.

11

The LTD Plan is "designed to begin when your 26 weeks of STD ends, provided you are totally disabled and you are enrolled to the LTD Plan." AR 1098. "A Long Term Disability is a disability in which you have become unable to perform the essential functions of your regular occupation (with or without reasonable accommodations) during the first year of the benefit payments. For benefits to continue after one year, you must be unable to work in any occupation (with or without reasonable accomodations) for which you are, or could be qualified for by training, education, or experience." Id. Total disability means that "during the portion of any period of disability not exceeding 24 months, plus the duration of the Elimination Period, the complete inability of the Participant, due to Sickness or Injury, to perform the material and substantial duties of the Participant's regular job, with or without reasonable accommodation." AR 986. Elimination Period is defined as "a period of continuous total disability due to Sickness or Injury that extends 26 weeks." AR 983.

On March 16, 2006, the Administrator denied Plaintiff's LTD claim because Plaintiff failed to prove continuous disability during the Elimination Period. AR 150. On April 1, 2006, the Administrator was changed from Broadspire Services to Reed Group. AR 151. On August 24, 2006, in order to bolster his disability claim, Plaintiff underwent a two-day Functional Capacity Evaluation ("FCE"), at the request of Dr. Krispak. AR 175.

12

The evaluation revealed that Plaintiff has limitations in spinal movement, lower extremity strength, unequal length of steps, lifting, bilateral carrying, elevated work, forward bending, walking, and sitting.  AR 177.  Specifically, the test found that Plaintiff has "some limitation" when sitting in an armchair.  AR 173.  The report defined "some limitation" as being able to perform the task 6 percent to 33 percent of the time, one level below "slight/no limitation," which is defined as being able to perform the task 34 to 66 percent of the time.  AR 171.  The evaluator opined that "[p]erformance was consistent between Day 1 and Day 2.  This indicates that work ability should be able to be sustained on a day to day basis."  AR 176.  Further, the "[c]lient's perceived abilities, as measured on the Orebro Musculoskeletal Pain Screening questionnaire were below those objectively identified in the FCE.  The client's perception of abilities is less than those the client was actually able to do safely."  Id.  The report did not include a full assessment of Plaintiff's ability to return to work because a job description was not provided.  AR 177.

On September 12, 2006, Plaintiff submitted an appeal of the denial of his LTD claim to the Administrator.  AR 46.  On October 10, 2006, after having reviewed the FCE report, Dr. Krispak wrote a letter giving his assessment of the report.  He opined that "[a] quick review of findings reveals diminished deep tendons reflexes of his left leg, abnormal performance on balance testing,

13

significant back and left leg pain, weakness in testing of occupational appropriate weight lifting, diminished trunk stability, limited bending, significant deviation from normal in walking pattern, and inability to remain seated for more than 13 minutes at a time." AR 139. Dr. Krispak further opined that "Mr. Zurawel has been a patient of mine since November of 2001 and is well known to me. I have seen a progressive decline in pain tolerance, gait function, and mental health due to chronic pain and decreased ability to perform activities of daily living." Id. Finally, Dr. Krispak concluded that "[b]ased upon the results of Mr. Zurawel's FCE report and his dependence on chronic pain medications to perform activities of daily living at sub-optimal performance, I believe he should be placed on permanent disability." Id. Plaintiff submitted both the FCE report and Dr. Krispak's letter to the Administrator on October 12, 2006. AR 109-10.

On November 16, 2006, the Administrator assigned Dr. Vernon Mark, M.D., a neurological surgeon. AR 76. In his report, Dr. Mark provided a summary of evidence he reviewed, including the FCE report, the CT scan, Dr. Papciak's report, and Plaintiff's own statements. AR 76-77. Dr. Mark also provided a list of restrictions that he believed was supported by the record. AR 78. However, Dr. Mark opined that "[t]his job requires [Plaintiff] to use a telephone and a computer. His objective neurological

14

function will allow him to do this kind of sedentary work. His claim to impairment and work restrictions are based on his subjective complaints of pain and his requirements for pain relieving medication. Pain is a private and not a public experience and it's very difficult to measure. This is particularly true in a man with a history of alcohol and drug abuse who also has Waddell signs on his functional capacity evaluation." Id. Moreover, he opined "[i]t is unknown if [Plaintiff have had] nerve root or peripheral nerve changes on objective electrophysiological tests that might correlate with neuropathic pain. If he does not, he would need more intensive psychiatric evaluation and treatment. If he does have these changes that correlate with neuropathic pain a trial of dorsal column stimulation would be in order. However, at the present time, without objective electrodiagnostic testing there are no objective neurosurgical changes documented in these records that would prevent him from carrying out his job as a medical writer." Id. Based on Dr. Mark's report, on December 14, 2006, the Administrator affirmed the denial of Plaintiff's LTD claim. AR 80.

Finally, on June 19, 2007, Plaintiff sent the Administrator a letter stating his intention to proceed with litigation. AR 27. However, Plaintiff stated that if a second appeal is required under the LTD Plan before Plaintiff can commence litigation, Plaintiff requested that the Administrator forward his record in its entirety

to the Pension Committee for appeal.   AR 28.   No additional
evidence was submitted for this appeal.   On August 1, 2007, Mr.
Richard McDonald, Director of the Pension Committee, sent Plaintiff
a letter stating that the Pension Committee had reviewed his claim
and upheld the denial of his LTD claim.   AR 32.   Mr. McDonald's
eight-page letter contained a detailed summary of all the evidence
in the record.   AR 33-37.   The letter also contained comprehensive
reasoning for denying Plaintiff's claim.   AR 37-38.   The letter
stated:

1.   "Contrary to your attorney's assertions, your complaints
of pain were taken into consideration in reviewing your file.   On
01/10/05, your own Pain Management Physician, Dr. Michael Rudman,
stated your pain level was decreasing after only (2) Biofeedback
Sessions.   In addition, he stated you needed a 'non-pharmacological
alternative treatment.'   Dr. Papciak in November of 2004 also noted
your pain level was reported as being 4/10 on the VAS scale.   This
is considered mild."

2.   "Dr. Krepsak [sic] on 02/22/06 stated <u>without any
objective testing on your true physical functionality</u> that you
could not sit; not climb stairs; not physically exert yourself; do
no bending; do no lifting; and do no walking of distance greater
than two hundred (200) feet."

3.   "On 08/24/06 and 08/25/06 you attended a Functional
Capacity Evaluation (FCE) ordered by your attorney.   This test was

16

not performed (according to the Physical Therapist) in relation to the requirements of your own specific job description as 'no Job Description was available'. Also the US Department of Labor Physical Demand Level upon which determinations are routinely/usually made as to the level of workability was not provide or requested by your attorney."

4.   "Overall, the Therapist stated 'consistent workability should be able to be sustained on a day to day basis' and your 'perception of abilities is less than those the client is actually able to do safely'."

5.   "Corporate Benefits sees no indication of a defined thirteen (13) minutes maximum ability to sit in the actual FCE document/report, but rather a 6% to 33% limitation (meaning in one hour you would be limited to sitting 3.6 to 19.8 minutes)."

6.   "Your record provides no objective verification or testing showing your cognitive abilities were affected negatively even though Broadspire stated in their letter dated 03/16/05 that 'objective testing should be submitted that would support your disability'. Also according to the STD Plan 'The employee must submit evidence of disability from the treating provider'."

7.   "In the Behavioral Health Evaluation done on 11/30/04 by Dr. Papciak, he noted 'no significant abnormality in recent or remote memory, attention span and concentration' refuting your cognitive deficit contention although no testing was provided."

17

8. "Based on these findings outlined above, Corporate Benefits sees nothing in your record then or now which would cause us to reverse the original decision upheld on appeals to deny your STD effective 03/16/05."

Lastly, the letter stated, "[b]ased on the above, Corporate Benefits upholds the clinical denial of your STD benefits and upholds the finding that you were/are ineligible to transition from STD to LTD."

### D.  The Complaint

Plaintiff commenced the instant matter on December 14, 2007. Plaintiff filed a four-count complaint that alleges that Defendants 1) wrongfully denied his STD claim; 2) wrongfully denied his LTD claim; 3) violated their fiduciary duties as trustees of the Plan, in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001(a)(1)(B), et seq.; and 4) failed to provide claim documents in violation of 29 C.F.R. § 2560.503-1(h)(2)(iii). Both parties filed motions for summary judgment on all counts. Defendants subsequently reconsidered their denial of the STD claim and awarded Plaintiff maximum STD benefits.  Plaintiff does not dispute this fact other than to claim that the subsequent payment of Plaintiff's STD benefits is a litigation tactic.  Regardless, because the STD claim has been resolved, Count One has been rendered moot.  Additionally, under Count Four, because Plaintiff did not specify which documents Defendants failed to provide, and

the record contains no evidence of any document requested by Plaintiff that was untimely received, the Court grants summary judgment to Defendants as to Count Four.  In sum, only Counts Two and Three remain and the Court will address these counts below.

## II.  Standard of Review

### A.  Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n. 1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Kaucher, 455 F.3d at 423.  Disputes over irrelevant or unnecessary facts will not

19

preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Monroe v. Beard, 536 F.3d 198, 206-07 (3d Cir. 2008).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts."  Id. at 206 (quoting Matsushita, 475 U.S. at 586).  Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial."  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence

and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. S.E.C. v. Antar, 44 Fed. Appx. 548, 554 (3d Cir. 2002).

**B. Applicable Standard of Review Under ERISA**

In evaluating Plaintiff's claim, the Court's first task is to determine the applicable standard of review under ERISA. The Supreme Court, in Firestone Tire and Rubber Co. v. Bruch, held that a denial of benefits under ERISA is to be reviewed "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989). Thus, where the plan affords the administrator discretionary authority, the administrator's interpretation of the plan "will not be dismissed if reasonable." Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d. Cir. 1997) (quoting Firestone, 489 U.S. at 111). In other words, when a plan administrator has discretion to determine a claimant's eligibility for benefits, the plan administrator's decision is subject to review under an arbitrary and capricious standard. Doroshow v. Hartford Life and Acc. Ins. Co., 574 F.3d 230, 233 (3d Cir. 2009).

However, "[i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of

interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Firestone, 489 U.S. at 115; see Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004). A conflict of interest can be created, for example, when an employer both funds and evaluates employee claims. Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2348 (2008). A conflict of interest can also be created if an employer pays an independent insurance company to both evaluate claims and pay plan benefits. Id. at 2349; Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 383 (3d Cir. 2000). However, a conflict of interest is not present if an employer funds a benefits plan, but an independent third party is paid to administer the plan. Pinto, 214 F.3d at 383. Additionally, if an employer establishes a plan and creates an internal benefits committee vested with the discretion to interpret the plan and administer benefits, a conflict of interest does not exist. Id.; see also Post v. Hartford Ins. Co., 501 F.3d 154, 164 n. 6 (3d Cir. 2007).

Recently, the Supreme Court in Glenn altered the way in which a conflict of interest is handled by the courts. Glenn, 128 S.Ct. at 2350. Previously, a finding of a conflict of interest resulted in the heightening of the arbitrary and capricious standard along a sliding scale, taking into account several factors including, the "sophistication of the parties, the information accessible to the parties, the exact financial arrangement between the insurer and

the company; and the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction." <u>Stratton v. E.I. Dupont de Nemours & Co.</u>, 363 F.3d 250, 254 (3d Cir. 2004) (internal quotations omitted).

<u>Glenn</u> rejected heightening the arbitrary and capricious standard. The Supreme Court reasoned that <u>Firestone</u> held that the word "factor" implies that courts should review the propriety of benefit denials, by taking into account many factors, including a conflict of interest. <u>Glenn</u>, 128 S.Ct. at 2351. Effectively, the Court reaffirmed <u>Firestone</u> to the extent that deference should be given to "the lion's share of ERISA claims." <u>Id.</u> at 2350. The Court opined that the conflict of interest may be more important in circumstances "suggesting a higher likelihood that it affected the benefits decision," and would prove less important "when the administrator has taken active steps to reduce potential bias." <u>Id.</u> at 2351. Potential bias could be reduced "by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits." <u>Id.</u> In any event, the governing standard requires Plaintiff to show that the denial of benefits was arbitrary and capricious, with a conflict of interest as simply one factor for the court's consideration. <u>Estate of Schwing v. The Lilly Health Plan</u>, 562 F.3d 522, 525 (3d.

Cir. 2009); see also Howley v. Mellon Financial Corp., No. 08-1748, 2010 WL 3397456, at *4 (3d Cir. Aug. 31, 2010).[2]

Under the arbitrary and capricious standard, the claim determination will be upheld if it is supported by substantial evidence. Doroshow, 574 F.3d at 234 ("Under a traditional arbitrary and capricious review, a court can overturn the decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law"). "The scope of this review is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." Id. (internal quotation marks omitted). Although the arbitrary and capricious standard is extremely deferential, "[i]t is not ... without some teeth." Moskalski v. Bayer Corp., No. 2:06-cv-568, 2008 WL 2096892, at *4 (W.D. Pa. May 16, 2008). "Deferential review is not no review, and deference need not be abject." Id. (citation omitted). Substantial evidence requires more than a "mere scintilla of evidence." Id. at *4 n. 3 (citation omitted). Ultimately, Plaintiff bears the burden of proof and must present required medical information to the Plan in order for the Plan

---

[2]    Plaintiff requested leave to submit a supplemental brief based on the Howley case. The Court denied that request because Howley is not analogous to this case, nor does Howley introduce any new law relevant to this case that would require a re-examination of prior precedents not already addressed by the parties.

(through the Claims Administrator) to find that he is disabled. See Mitchell, 113 F.3d at 439-440.

## III. Discussion

### A. Conflict of Interest

At the outset, the Court notes that both parties agree that the arbitrary and capricious standard is the applicable review in this case.  However, Plaintiff contends that this review must be conducted with an eye on Defendants' conflict of interest in this case.   Plaintiff raises several allegations with regard to Defendants' conflict of interest, both structural and procedural. The Court will address each one separately, and also assess them in the aggregate to determine whether a conflict exists.

Plaintiff raises one structural conflict of interest – that the Administrator was paid for and hired by Defendants to administer claims.   Plaintiff contends that this type of arrangement gives the Administrator a financial incentive to deny claims in order to satisfy Defendants.  This has no support in case law.  In Glenn, the Supreme Court held that a conflict of interest exists if an employer both funds and administers an ERISA plan. 128 S.Ct. at 2348.  Likewise, a conflict of interest exists if the employer pays an administrator to both fund and administer a plan. Id. at 2349.   The Supreme Court reasoned that in each of those scenarios, because the administrator is also the payer of claims, there is a direct savings to the administrator if a claim is

25

denied.  Id.  However, this structural conflict of interest is mitigated when, as here, the employer funds the plan, but hires a third-party to administer the plan.  Pinto, 214 F.3d at 383.  This is especially true when the employer also creates an internal committee with discretion to interpret the plan and administer benefits.  Id.; see also Post, 501 F.3d at 164 n. 6.  Plaintiff's suggestion that a conflict is created merely because the Administrator is being paid by Defendants is plainly contrary to cases where a structural conflict of interest has been found.  See, e.g., Dunn v. Reed Group, No. 08-1632, 2009 U.S. Dist. LEXIS 78857, at *9 (D.N.J. Sep. 2, 2009)(this Court held that this very same LTD Plan arrangement did not present a conflict of interest).  As such, the Court finds that in this instance there is no structural conflict.[3]

---

[3]     Plaintiff and Defendants appear to focus on the fact that the Plan is funded through a trust set up by Defendants from employee contributions in the form of salary deductions. Plaintiff and Defendants disagree whether this would be considered an employer-funded plan.  The Court finds the distinction immaterial.  Although the plan is technically funded through salary deductions, it would still be considered an employer-funded plan; it makes no difference whether the employer funds the plan directly or gives the money to the employees but then deducts that amount from their salaries.  See Tyson v. Pitney Bowes Long-Term Disability Plan, No. 07-3105, 2009 WL 2488161, at *6 (D.N.J. Aug. 11, 2009).  Regardless, this distinction does not change the conflict of interest analysis. Likewise, Plaintiff's reliance on the Ninth Circuit case, Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016 (9th Cir. 2008), for the proposition that an employee-funded trust plan could create a conflict of interest is misplaced, because in that case the employer also served as the plan administrator.  Id. at 1018.

Plaintiff also raises several procedural conflicts of interest. First, Plaintiff argues that Defendants' failure to order an IME (Independent Medical Evaluation) or a FCE (Functional Capacity Evaluation) as part of their review process constitutes a procedural irregularity. A thorough reviewer, Plaintiff argues, would require such information before making an informed decision. Plaintiff's argument is specious. Under the LTD Plan, as Plaintiff concedes, the Administrator has the <u>option</u> of conducting, but is <u>not</u> <u>required</u> to conduct, an IME or a FCE on a claimant if it so chooses. <u>See</u> AR 1103. While Plaintiff maintains that Defendants are obligated to conduct an IME/FCE to rebut Plaintiff's <u>prima</u> <u>facie</u> case of disability, as discussed <u>infra</u>, Plaintiff has failed to satisfy his burden of proving that he suffers from a disability. Because Plaintiff did not establish a <u>prima</u> <u>facie</u> case, it is not a procedural irregularity nor arbitrary and capricious if a reviewer does not conduct an IME or FCE. <u>Vega v. Cigna Group</u> <u>Insurance</u>, No. 06-5841, 2008 WL 205221, at *7 (D.N.J. Jan. 23, 2008); <u>Feigenbaum v. Merrill Lynch & Co., Inc. Basic Long Term</u> <u>Disability Plan</u>, No. 06-1075, 2007 WL 2248096, at *4 n. 11 (D.N.J. Aug. 2, 2007); <u>see</u> <u>Abnathya v. Hoffmann-La Roche, Inc.</u>, 2 F.3d 40, 47 (holding that plan administrator was not specifically required to request an additional examination unless the employee first submits proof of continuing disability). It is not Defendants' burden to determine the existence of Plaintiff's disability; it is

enough that they determine, reasonably, that Plaintiff has failed to satisfy his burden of proof.

Next, Plaintiff argues that a conflict of interest exists because Defendants' consultants were paid for their services. Plaintiff offers no legal support for his contention, and indeed, the Court cannot find a single case within the Third Circuit holding that a paid consultant gives rise to an inference of impropriety. See Keller v. AT&T Disability Income Plan, No. 08-0568, 2009 WL 1438802, at *1 (W.D. Tex. May 19, 2009) (holding that how much consultants are paid has no relevance to whether or not a denial of benefits was arbitrary and capricious). In fact, it would be reasonable to assume that most, if not all, medical consultants and reviewers used by ERISA plan administrators, in this Circuit or otherwise, are paid for their services. Unless there is proof of actual impropriety, such as reviewers recieving financial incentives to specifically deny or delay claims, see, e.g., Grider v. Keystone Health Plan Central, Inc., No. 01-05641, 2003 WL 22182905, at *20 (E.D.Pa. Sept. 18, 2003), the mere fact that reviewers receive payment for their services is not enough to give rise to an inference of conflict.[4]

---

[4]     Plaintiff cites two cases, outside of this circuit, as support that payment to consultants could be a conflict of interest, Kalish v. Liberty Mut., 419 F.3d 501, 508 (6th Cir. 2005) and Hogan-Cross v. Met. Life Ins. Co., 568 F.Supp.2d 410, 414 (S.D.N.Y. 2008). Aside from the fact that the Court is not bound to follow these cases, Plaintiff misconstrues each of these cases. Kalish requires more than just mere payments to

Further, Plaintiff erroneously claims that a procedural irregularity exists because Defendants approved his STD benefits but later denied his LTD benefits. First, under the Plan, the burden of proof regarding the time periods during which Plaintiff must prove disability is different between STD and LTD claims. Compare AR 1092 with AR 1098; see also Gambino v. Arnouk, 232 Fed.Appx. 140, 147 (3d Cir. 2007) ("The STD and LTD plans contain different elimination periods"). Satisfying the burden of proving "immediate" disability, as is normally required for STD, does not give rise to a presumption that Plaintiff is also disabled for the purpose of his LTD claim. Indeed, Plaintiff has to prove that he is disabled under a different standard in a LTD claim, regardless of whether he was approved for STD benefits. See Evans v. Employee Benefits Plan, No. 03-4915, 2007 WL 2212607 (D.N.J. July 30, 2007) (holding that denial of LTD benefits was not arbitrary and capricious even though claimant was approved for and received STD benefits).

Finally, Plaintiff contends that Defendants' failure to consider Plaintiff's application and subsequent approval for Social Security disability benefits is a procedural irregularity. The

---

consultants for a finding of conflict, see 419 F.3d at 508 (requiring, beyond merely payment, a history of consistent denial of claims, not merely a history of consultation for the plan administrator), and Hogan-Cross involved a ruling on a discovery request and did not address if a conflict actually existed. 568 F.Supp.2d at 414.

reviewing court may consider the SSA's decision as a factor in evaluating whether the administrator's denial of benefits is arbitrary and capricious. <u>Marciniak v. Prudential Financial Ins. Co. of Am.</u>, 184 Fed. Appx. 266, 269 (3d Cir. 2006). However, "a Social Security award does not in itself indicate that an administrator's decision was arbitrary and capricious, and a plan administrator is not bound by the SSA decision." <u>Id.</u> Accordingly, the absence of any discussion of Plaintiff's SSA award by Defendants has no relevance in determining whether a conflict of interest exists.

Having reviewed the totality of Plaintiff's allegations of conflict, the Court does not find that Defendants acted improperly. None of the allegations raised are related to each other, or suggest an overall scheme by Defendants to act disingenuously. Rather, the complaints Plaintiff makes are based upon his disagreement with Defendants' decision to deny his LTD claim. Having found no proof that Defendants acted while in a conflict of interest, the Court will not consider it a factor in conducting a review of Defendants' denial of benefits.[5]

---

[5]     Plaintiff makes other allegations that he believes amount to procedural irregularities that would prove Defendants acted in conflict, such as providing only partial records to medical consultants, the Pension Committee's "rubber stamping" of the Administrator's decision, and inadequate expertise on the part of the medical consultants. None of these raise an inference of conflict, but rather go to the sufficiency of Defendants' denial. Therefore, these arguments will be reviewed as such <u>infra</u>.

**B.  Denial Under the LTD Plan**

Plaintiff attacks the review process of his LTD claim at every level, and in particular the opinions of every medical consultant upon whom the Administrator relied.  The Court will address each in detail.  The Court will then address the final appeal to the Pension Committee.

**1.  Dr. Blumberg**

Plaintiff contends that Dr. Blumberg's report was flawed because 1) he did not review all of the evidence submitted by Plaintiff; 2) he disregarded Dr. Kripsak's findings; and 3) he used unsubstantiated statements from Dr. Kripsak to support his findings.

To begin, Plaintiff asserts that Dr. Blumberg did not consider records from Dr. Rudman and Dr. Carl.  However, the record shows that Plaintiff did not submit those records until 04/14/05, after Dr. Blumberg had already completed his report.  AR 229. Furthermore, Dr. Blumberg's finding that there is a lack of objective evidence supporting Plaintiff's disability is supported by substantial evidence.  The medical statements and evidence proffered by Dr. Kripsak were scant, at best.  While the office treatment notes are devoid of records of physical evaluation, they do chronicle continued treatment of pain, as evidenced by a long list of pain medications prescribed over the years.  However, despite Dr. Kripsak's familiarity with Plaintiff, on all three

31

occasions when the Administrator requested Attending Physician Statements from Dr. Kripsak, he did not claim that Plaintiff was totally disabled.  For example, while Dr. Kripsak continued to extend Plaintiff's return-to-work date, on the last of the three statements, Dr. Kripsak opined that Plaintiff was "at least 8 more weeks" from being able to return to his job.  Clearly, Dr. Kripsak's comment, at that time, was insufficient to show that Plaintiff suffered from a long-term, continuing disability.  AR 860.

Finally, Plaintiff contends that Dr. Blumberg based his conclusions on Dr. Kripsak's representation, during a peer-to-peer phone conversation, that "Dr. Kripsak could not see any reason why the claimant could not perform sedentary work activities, other than the fact that he has pain."  AR 348.  Plaintiff asserts that Dr. Kripsak never made those statements to Dr. Blumberg, and therefore, Dr. Blumberg's conclusions were baseless.  As proof, Plaintiff offers his own statement that Dr. Kripsak told him that those statements were never made.  However, Plaintiff's own statement, which is hearsay, is insufficient to create a genuine issue of material fact; indeed, Plaintiff could have obtained a certification from Dr. Kripsak, but did not.  Regardless whether Dr. Kripsak made such a representation, the burden of proof rests on Plaintiff.  Dr. Blumberg did not need an affirmative representation from Dr. Kripsak to "disprove" Plaintiff's claimed

32

disability.  In fact, Dr. Blumberg was not even required to conduct further investigation by calling Dr. Kripsak.  <u>Pinto</u>, 214 F.3d at 394 n. 8 (holding that there is no affirmative duty on plan administrators to conduct good faith and reasonable investigation). Rather, Dr. Blumberg determined, <u>inter</u> <u>alia</u>, that Plaintiff's medical records lacked objective testing to support disability.  AR 348.   Thus, the Court does not find Dr. Blumberg's findings arbitrary and capricious.

## 2.  Dr. Ennis

Plaintiff claims that Dr. Ennis only reviewed selected medical records.   At first, Plaintiff specifically argues that the Administrator "selected only a few records to give" to Dr. Ennis, but then accused Dr. Ennis of "brushing aside" the majority of the medical documents and "disregarding" the quintessential objective evidence of the CT scan.  It appears that Plaintiff is suggesting that Dr. Ennis disregarded medical evidence that he supposedly did not have.  However, a review of Dr. Ennis's report indicates that he had a substantial portion of the medical records Plaintiff submitted.  AR 522-23.  While Dr. Papciak's findings were not explicitly referenced in Dr. Ennis's report, given the inconclusiveness of Dr. Papciak's report, as will be explained below, it was not arbitrary and capricious for Dr. Ennis to discount it.

33

Both the reports of Dr. Papciak and Dr. Rudman, who referred Plaintiff to Dr. Papciak, fail to support Plaintiff's claimed disability.  Both doctors evaluated Plaintiff for pain management, but did not directly treat Plaintiff's spinal injury.  Indeed, they focused on Plaintiff's subjective complaints of pain, and their evaluations of the underlying cause were ancillary to their treatment of pain.  In that regard, unsurprisingly, their reports contained no discussion of the underlying cause, nor any opinions on Plaintiff's underlying condition.  For example, Dr. Rudman opined on two separate occasions that Plaintiff's pain level was a 2/10, AR 273, and 4/10, AR 272, but "could get as bad as 10/10 at other times."  AR 273.  There was no explanation given as to why the pain could spike up to 10/10 at times, nor how Dr. Rudman could objectively come to such a determination.  These findings do not provide objective evidence of Plaintiff's disability; they merely provide the existence of Plaintiff's subjective complaints of pain.

Additionally, neither Dr. Rudman or Dr. Papciak ever expressed a belief that Plaintiff might have a permanent disability, or that Plaintiff could not have performed the essential functions of his employment based upon Plaintiff's experience of pain.  Furthermore, Dr. Papciak was only recommended by Dr. Rudman to evaluate the possibility of treating Plaintiff with behavioral therapy, AR 277, which Plaintiff summarily refused.   AR 279.   Lastly but significantly, all visits by Plaintiff to both Dr. Rudman and Dr.

34

Papciak occurred _after_ the onset of the claimed disability.
Therefore, there is no objective comparison of the level of pain
Plaintiff experienced prior to the alleged onset date and the pain
Plaintiff experienced after the onset date.   Without this
comparison there is no objective indication that Plaintiff's
symptoms have worsened over time - as he so claims.

   The Court also disagrees with Plaintiff's conclusion that the
CT scan and Dr. Carl's reports were definitive proof of Plaintiff's
disability.   Defendants contend that this evidence is irrelevant
because it was obtained years _before_ the alleged onset of
disability.   Indeed, it was reasonable for Defendants to discount
outdated medical evidence when Plaintiff's own conduct during the
relevant period contradicted his claim of disability.   Plaintiff
worked for _two years_ after his consultations with Dr. Carl.   This
is not a case where Plaintiff tried to return to work after the
discovery of his disability, only to find that he was unable to do
so.

   There is no question, and Defendants do not disagree, that
Plaintiff has a physical impairment.   However, because Plaintiff
suffered this injury years before his employment at J&J, and that
he was subsequently able to become gainfully employed for years
despite this injury, it is not enough for Plaintiff to show an
existence of injury to quality for LTD benefits in this instance.
Rather, Plaintiff was obligated to submit objective medical

evidence that his injury had deteriorated substantially over time and that his injury had worsened to the point where he was no longer able to perform the essential duties of his job.  Evidence from 2002 alone is of little significance for this purpose.  See, e.g., Sarlo v. Broadspire Services, Inc., 439 F.Supp.2d 345, 360 (D.N.J. 2006) (holding that medical consultant was not arbitrary and capricious in discounting outdated evidence of plaintiff's cognitive impairments three years before the claimed onset of disability, when there was no evidence of such impairments in the interim).  Furthermore, nowhere in Dr. Carl's reports did he suggest that Plaintiff was totally disabled.  In fact, he recommended an aggressive regimen of therapy designed to strengthen Plaintiff's back muscles.  AR 842-43.  Dr. Carl also stated that the "CT scan revealed everything from the previous surgery [on Plaintiff's spine] to be solid," AR 835, suggesting that no significant deterioration occurred at that time - this directly contradicts Plaintiff's assertion that his disability worsened over time.

The remaining objective evidence submitted by Plaintiff as proof of his disability – the x-ray report and the "Lumbar Evaluation" – are inconclusive.  The radiologist who reviewed the x-ray reported that "[t]here are no prior studies for comparison." AR 850.  The report further stated that "[t]here is severe levoscoliosis as well as multilevel degenerative changes difficult

36

to evaluate while due [sic] to the overlying rods." Id.  Although the report conclusively shows that Plaintiff has a spinal injury and some degeneration, it does not specify the extent of the degeneration due to lack of comparison.  This, by itself, is insufficient to prove total disability.  While Plaintiff emphatically argues that even a plain eye can see how Plaintiff's spine does not look "normal," Plaintiff admits that his spine was injured in the 1986 accident, and that he has walked with an altered gait and used a cane for assistance since the accident.

The Lumbar Evaluation report, conducted by Ms. Barrows, is likewise inconclusive.  The report stated that Plaintiff experienced increased pain while standing, sitting, and lying down. AR 846.  The report also concluded that Plaintiff is likely to be a poor candidate for rehabilitation, without stating any reason. Nevertheless, the physical therapist recommended therapy  three times a week for four weeks, with the stated goal of "[restoring] previous level of function."  AR 847.

Lastly, Plaintiff questions the reliability of Dr. Ennis's report because it failed to address every single piece of evidence.[6]  However, medical reviewers are not required to do so,

_____

[6]     Plaintiff uses the decision in Fleming v. Kemper National Services, 2005 U.S. Dist. LEXIS 17335 (S.D. Cal. April 11, 2005), to discredit Dr. Ennis's report in this case. Essentially, Plaintiff argues that because that court found Dr. Ennis's decision inadequate for the purposes of that case, this Court should follow suit.  In addition, Plaintiff also cites to out-of-circuit cases which have examined Dr. Mark's reports.  The

as long as they provide sufficient rationale for their opinions. Sarlo, 439 F.Supp.2d at 362 (D.N.J. 2006); Cillaq v. Unicare Retirement Plan, No. 95-2975, 1996 WL 325889, at *5 (E.D. Pa. June 13, 1996). Dr. Ennis stated in his report that "[a]t the present time, from an orthopedic perspective, there are no specific objective findings that would support a functional impairment from 03/16/05 onwards preventing the claimant from returning to sedentary activities." AR 369. Based on the Court's analysis of the evidence before Dr.Ennis, the Court finds that Dr. Ennis's conclusions were based upon substantial evidence, and thus not arbitrary and capricious.

### 3. Dr. Mark

Lastly, Plaintiff attacks the credibility of the Administrator's third medical reviewer, Dr. Mark. As "proof," Plaintiff points out that Dr. Mark is 85 years old and has not been in active practice for 25 years, even though he remains board certified in neurological surgery.[7]   Furthermore, because the

---

Court rejects Plaintiff's assertion, as it has an independent duty to analyze reports of Drs. Ennis and Mark within the facts of this case.

[7]     While Plaintiff attacks the qualifications of Defendants' medical consultants, Plaintiff himself did not seek consultation from a qualified specialist on his spinal injury, except two visits to Dr. Carl in 2002.  In fact, all three of Defendants' medical consultants are experts in the relevant field implicated by Plaintiff's medical issues: both Dr. Blumberg and Dr. Ennis are board-certified orthopedic surgeons, and Dr. Mark is board-certified in neurological surgery.

report is unsigned, Plaintiff makes the baseless accusation that Dr. Mark is a "figment of imagination" made up by the Administrator.   Plaintiff's Reply Brief, at 3.   Ironically, Dr. Mark's report was the most thorough of the three medical consultants hired by the Administrator, with specific factual findings from Plaintiff's medical records, AR 76-77, and a list of restrictions that he found were supported by the evidence.   AR 78. Dr. Mark even detailed what medical procedures he recommends to further evaluate Plaintiff's injuries.   Id. ("However, at the present time, without objective electrodiagnostic testing there are no objective neurosurgical changes documented in these records that would prevent him from carrying out his job as a medical writer"). Plaintiff attacks these recommendations as contrary to Dr. Rudman's recommendations, AR 274 ("To not continue to pursue the possibility of spinal cord stimulation since we both agree that it is more likely a very poor choice given his pain complaints"), and uses that as basis for claiming that Dr. Mark completely disregarded Dr. Rudman's report and was thus arbitrary and capricious.   However, "[a] professional disagreement does not amount to an arbitrary refusal to credit [a treating physician]."   Stratton, 363 F.3d at 258.

Plaintiff also contends that Dr. Mark improperly disregarded the findings contained in the FCE report and ignored Dr. Kripsak's letter dated October 10, 2006, in which Dr. Kripsak opined "I

believe [Plaintiff] should be placed on permanent disability." AR
139. This contention is not supported by the record. The FCE
report did not conclude that Plaintiff was permanently disabled.
The report stated that Plaintiff's performance was "consistent
between Day 1 and Day 2. This indicates that work ability should
be able to be sustained on a day to day basis." AR 176. While the
report found that Plaintiff has significant physical limitations,
AR 177, "[c]lient's perceived abilities . . . are below those
objectively identified in the FCE. The client's perception of
abilities is less than those the client was actually able to do
safely." Id. Furthermore, Plaintiff contends that the FCE report
conclusively proved that he can sit for no more than 13 minutes at
a time. Contrary to Plaintiff's assertion, based upon the Court's
own examination, the report only stated that Plaintiff has "some
limitation" with regard to "sitting - arm chair," one level below
"slight/no limitation." AR 173. In fact, the report indicated
that this equates to having the ability to sit from 6 percent of
the time to 33 percent of the time. AR 171. Indeed, nothing in
the report supports Plaintiff's claim that he cannot sit for more
than 13 minutes an hour. AR 171. Significantly, the report does
not indicate, as Plaintiff contends, how long Plaintiff can sit at
one time. The report also does not explain what "33 percent of the
time" signifies; there is no suggestion that it is an hourly figure
or an indication of continuousness. The report also does not

40

comment on whether accommodations allowing frequent change of position would alleviate this limitation.   Certainly, it was not arbitrary and capricious for Dr. Mark to conclude that the FCE report did not provide sufficient objective evidence of Plaintiff's disability.

Moreover, as stated above, Dr. Kripsak did not initially find Plaintiff to be totally disabled.   It was not until Dr. Kripsak reviewed the FCE report, almost two full years after Plaintiff's alleged onset date, that he finally opined, "[b]ased upon the results of Mr. Zurawel's FCE report and his chronic pain medications to perform activities of daily living at sub-optimal performance, I believe he should be placed on permanent disability."   AR 160.   ERISA does not require plan administrators to accord special deference to opinions of treating physicians, nor does it impose a heightened burden of explanation on administrators when they reject a treating physician's opinion.   Black & Decker Disability Plan v. Nord, 538 U.S. 822, 829-30 (2003).

Finally, Plaintiff contends that Dr. Mark ignored his subjective complaints of pain, and Plaintiff's claims that his prescribed medications hampered his ability to concentrate and hindered the performance of his job.   While the Court recognizes that debilitating pain can qualify as a disability, the Court finds Plaintiff's claim of subjective pain unsubstantiated.   First, as discussed above, there is no conclusive evidence that Plaintiff is

41

disabled for <u>any</u> reason.[8]  Furthermore, while Plaintiff's extensive use of pain medication since his 1986 accident is undisputed, Plaintiff offers inadequate evidence to explain why his pain, or the effects of his medications, had suddenly caused a disability in October of 2004, while he was able to maintain gainful employment between June 2001 and October 2004.  <u>See</u> <u>Dolfi v. Disability Reins. Mgmt. Servs., Inc.</u>, 584 F.Supp. 2d 709, 735 (M.D. Pa. 2008)(medical consultants' findings that the plaintiff's subjective complaints of pain are inconsistent with the objective evidence available is not arbitrary and capricious).  There is also no objective evidence that shows Plaintiff's pain has increased over time; neither Dr. Rudman - Plaintiff's pain management doctor – nor Dr. Papciak found that Plaintiff suffered debilitating pain during their examinations, and they both relied purely on Plaintiff's representation that he often suffered from severe pain.  In sum, none of the evidence presented by Plaintiff establishes that the pain Plaintiff suffered was so debilitating as to prevent him from performing the essential functions of his job as a medical writer.

---

[8]     In this regard, Plaintiff's reliance on <u>Kaufmann v. Metro Life Ins. Co.</u>, 2009 U.S. Dist LEXIS 87876, at *27 (E.D. Pa. 2009), is inapposite.  In that case, as is not the case here, the claimant underwent a "multitude of tests that corroborated" the claimant's suffering of pain.  <u>Id.</u> at *27.  As discussed, Plaintiff provided no testing results to corroborate the level of pain he was allegedly experiencing.  Certainly, there were no medically objective tests to support Plaintiff's alleged inability to perform the essential functions of his job due to his pain.

In addition, Plaintiff submits that his prescription medicines affected his judgment and ability to focus on his job, which Plaintiff also contends is the opinion of his supervisor. However, as Dr. Mark stated, "[p]ain is a private and not a public experience and it's very difficult to measure. This is particularly true in a man with a history of alcohol and drug abuse who also has Waddell signs on his functional capacity evaluation." AR 78. Clearly, Dr. Mark was not convinced that Plaintiff's inability to focus or concentrate is a product of his prescribed medications. Dr. Mark also pointed to evidence that suggests Plaintiff may not be entirely willing to demonstrate his total capacity. See, e.g., AR 177. Given the fact that Plaintiff has been through drug addiction programs four separate times – the last of which occurred as recently as 2004, the same year as the alleged onset of Plaintiff's disability – coupled with his self-professed alcoholism, AR 276, the Court does not find Dr. Mark's conclusion arbitrary and capricious when Plaintiff provided no objective proof of diminished mental capacity due to prescription medications other than his own statements.

In sum, Plaintiff discredits these reports as not having disproved Plaintiff's alleged disability. Plaintiff bases a substantial part of his allegations on the premise that he has in fact established a prima facie case of disability that Defendants must then rebut. The burden of proof, however, rests with

43

Plaintiff at all times.  Mitchell, 113 F.3d at 439-440.  As stated supra, Defendants' approval of STD benefits does not shift the burden of proof, with regard to Plaintiff's LTD claim, from Plaintiff to Defendants, nor are Defendants required to give credence to every single assertion Plaintiff makes.  In reviewing Defendants' denial, the Court is not free to substitute its own judgment for that of the Administrator, or adopt the explanations provided by Plaintiff; the Court can only assess whether that determination is supported by substantial evidence.  Doroshow, 574 F.3d at 234.  Although the reports did not address in totality the sum of Plaintiff's medical records, their conclusions are remarkably consistent: Plaintiff has failed to satisfy his burden of proof as he has not objectively established the existence of the alleged disability.  Therefore, the Court holds that Defendants' findings and conclusions are supported by substantial evidence and are not arbitrary and capricious.

## 4.  Final Appeal to the Pension Committee

Plaintiff alleges that Richard McDonald, as the director of the Pension Committee with discretionary authority under the Plan, and final authority on all appeals, ignored his duties to review appeals "without deference to any of the prior determinations regarding [Plaintiff's] claim."[9]  AR 1106.  Plaintiff contends that

---

[9]     Because the Court has already dismissed Plaintiff's STD claim, the Court will focus solely on Mr. McDonald's letter dated August 1, 2007 that denied Plaintiff's LTD claim.

Mr. McDonald twisted the evidence submitted by Plaintiff and basically reiterated the conclusions of the reports submitted by medical consultants on prior denials.  However, a review of Mr. McDonald's letter reveals a comprehensive summary of all records, and an independent assessment of evidence submitted.  In his eight-page denial letter, Mr. McDonald painstakingly listed a detailed record of all evidence that was considered under his review, as well as a summary of the procedural history of Plaintiff's appeal process.  AR 33-37.  Then the letter went on to provide a list of reasons why Plaintiff's claim was denied, including but not limited to 1) Plaintiff's own doctors' examination of Plaintiff's pain did not comport with Plaintiff's subjective complaint of pain, AR 37; 2) lack of objective evidence supporting Plaintiff's treating physician's conclusions, Id.; 3) the FCE report was inconsistent with Plaintiff's claim of disability, AR 38 ("Corporate Benefits sees no indication of a defined thirteen (13) minutes maximum ability to sit in the actual FCE document/report"); and 4) no objective evidence of loss of cognitive abilities other than Plaintiff's own statements. Id. ("Dr. Papciak, he noted 'no significant abnormality in recent or remote memory, attention span and concentration' refuting your cognitive deficit contention"). Notably, Mr. McDonald did not mention reports from any of the medical consultants in his explanation, which indicated that Mr. McDonald performed an independent review of Plaintiff's evidence.

45

Although Mr. McDonald certainly did not address every piece of evidence he considered – which he is not required to do under the law – his letter addressed 1) Plaintiff's functional capacity; 2) the essential duties of Plaintiff's occupation; 3) the lack of evidence supporting Plaintiff's alleged disability; and 4) Plaintiff's own subjective complaints.  Given the Court's findings above concerning the evidence submitted by Plaintiff, and Mr. McDonald's thoroughness in his consideration, the Court finds that his denial was supported by substantial evidence and therefore not arbitrary and capricious.

Accordingly, the Court finds that Defendants' decision to deny Plaintiff's LTD benefits is not arbitrary and capricious.

**C.   Breach of Fiduciary Duties**

Plaintiff alleges in Count Three of the Complaint that Defendants breached their fiduciary duties to Plaintiff as a beneficiary of the Plan in violation of 29 U.S.C. § 1104. Plaintiff reasons that Defendants failed to discharge their fiduciary duties by improperly denying Plaintiff's disability claims.  Plaintiff seeks equitable relief in form of an injunction barring Defendants from future impropriety, declaratory judgment that Defendants failed to comply with the terms of the Plan and breached their fiduciary duties, and the removal of the Pension Committee as the plan administrator.  Based on the nature of his claim and the relief sought, it appears that Plaintiff's breach of

46

fiduciary claim arises out of 29 U.S.C. § 1132(a)(3).

Title 29 of United States Code section 1132(a)(3) states that "[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." Section 1132(a)(3) authorizes equitable relief directly to a participant or beneficiary to redress any act or practice which violates any provision of ERISA, including a breach of the statutorily created fiduciary duty of an administrator. Bixler v. Cent. Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1298 (3d Cir. 1993). There is no bright-line rule precluding the assertion of a § 1132(a)(3) claim merely because a plaintiff has also brought a claim under § 1132(a)(1)(B).[10] DeVito v. Aetna, Inc., 536 F.Supp.2d 523, 533-34 (D.N.J. 2008).

Plaintiff bases his § 1132(a)(3) claim on the same conduct by Defendants that gives rise to his § 1132(a)(1)(B) claim. While a party generally is precluded from re-raising substantially the same

---

[10]     Section 1132(a)(1)(B) authorizes participants and beneficiaries to "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." This is essentially the cause of action for Plaintiff's wrongful denial of benefits claim.

47

claim under § 1132(a)(3) that it raises under § 1132(a)(1)(B), see Eichorn v. AT&T Corp., 484 F.3d 644, 655 (3d Cir. 2007), in this case, Plaintiff's § 1132(a)(3) claim does not seek the same remedy as his § 1132(a)(1)(B) claim – Plaintiff's § 1132(a)(1)(B) claim seeks to restore benefits allegedly wrongfully denied by Defendants, while his § 1132(a)(3) claim seeks to enjoin Defendants from future wrongful conduct. Therefore, despite Defendants' argument to the contrary, Plaintiff's § 1132(a)(3) claim is not precluded by Plaintiff's § 1132(a)(1)(B) claim.

Nevertheless, Plaintiff's § 1132(a)(3) claim fails on other grounds. First, the relief sought by Plaintiff does not redress his injuries; enjoining Defendants from future wrongful conduct in no way provides Plaintiff relief from Defendants' decision denying his LTD claim under the Plan. Likewise, enjoining Defendants from future actions would not protect Plaintiff from future harm since Plaintiff is no longer an employee of J&J. Obviously, future actions taken by Defendants in this context will unlikely affect Plaintiff. Thus, without redressability, Plaintiff has no standing to bring his breach of fiduciary duty claim. Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 190 (3d Cir. 2006) ("Finally, the injury alleged must be redressable by the remedy sought").

Even assuming Plaintiff does have standing, because the Court has already found that Defendants acted properly in denying Plaintiff's disability claims, Plaintiff's breach of fiduciary

claim necessarily fails on the merits. Accordingly, the Court grants summary judgment for Defendants on Count Three of the Complaint and denies Plaintiff's motion for the same.

## IV.  Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgment is **GRANTED**.  An appropriate Order shall follow.


Date: September 27, 2010

                              /s/ Freda L. Wolfson
                         The Honorable Freda L. Wolfson
                         United States District Judge

49